UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VAN CHESTER THOMPKINS, Jr.

        Petitioner,

                                    CASE NO. 05-CV-70188-DT
v.                                  Honorable Patrick J. Duggan

MARY BERGHUIS,

        Respondent.

_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan on September 28, 2006.

Present:      THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Petitioner Van Chester Thompkins, Jr., ("Petitioner"), presently confined at the

Brooks Correctional Facility in Muskegon Heights, Michigan, seeks the issuance of a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.  In his application, filed by his attorney,

Petitioner challenges his conviction on one count of first-degree murder, MICH. COMP.

LAWS ANN. § 750.316; one count of assault with intent to commit murder, MICH. COMP.

LAWS ANN. § 750.83; three counts of possession of a firearm in the commission of a

felony, MICH. COMP. LAWS ANN. § 750.227b; one count of felon in possession of a

firearm, MICH. COMP. LAWS ANN. § 750.224f; and one count of carrying a concealed

1

weapon in a motor vehicle, MICH. COMP. LAWS ANN. § 750.227.  For the reasons stated

below, the petition for writ of habeas corpus is DENIED.

On May 20, 2002, Petitioner was convicted of fatally shooting Samuel Morris and

wounding Frederick France on January 10, 2000, in Southfield, Michigan.  The trial court

sentenced Petitioner on June 4, 2002.  His conviction and sentence were affirmed on

appeal.  *People v. Thompkins*, No. 242478 (Mich. Ct. App. Feb. 3, 2004).  The Michigan

Supreme Court denied Petitioner's request for leave to appeal.  *People v. Thompkins*, No.

125667 (Mich. July 29, 2004).  Petitioner filed the pending writ of habeas corpus on

January 19, 2005.

Petitioner raises the following claims in support of his request for habeas corpus

relief:

> I.    Prosecutorial misconduct denied Petitioner due process
>       of law in the following ways:
>
>       a.    The prosecutor offered evidence of Petitioner's
>             co-defendant's jury verdict and guilty plea
>             conviction, offered evidence of an uncharged
>             acquaintance's unrelated bad acts, and offered
>             opinion evidence on the guilt of the Petitioner.
>
>       b.    The prosecutor elicited evidence of Petitioner's
>             exercise of his right to remain silent and of his
>             right to counsel and he denigrated counsel.
>
>       c.    The prosecutor's questioning of Tomika
>             Stephens and of Detective Helgert concerning
>             Petitioner's one-year absence from the
>             jurisdiction was improper where its effect both
>             explicitly and implicitly was to offer evidence
>             that Petitioner had committed crimes other than

2

the ones for which he was on trial.

    d.    The prosecution offered unfairly prejudicial information by circumventing the rules of evidence in pretending to use the Purifoy letters for impeachment.

    e.    The prosecution argued facts not in evidence.

    f.    The prosecutor asked the jury to sympathize with the mother of the deceased.

    g.    The prosecution shifted the burden of proof to the defense in the rebuttal argument.

II.    Petitioner was denied the effective assistance of counsel where trial counsel failed to object to prosecutorial misconduct which included a trial-long effort to convict Petitioner based on guilt by association.  The trial court clearly err when it denied appellant's request for an evidentiary hearing on this issue.

III.    Where petitioner remained mute for three hours after being informed of his Miranda rights and where he refused to sign the rights form, he was unequivocally exercising his Fifth Amendment privilege against self-incrimination.  The answers given at the very end of that time period were elicited in violation of the Due Process Clause and also in violation of <u>Miranda v. Arizona</u>

IV.    The trial court erred in denying the motion to suppress Frederick France's in-court and out-of-court identification of Petitioner as the shooter.

Respondent filed an answer to the Petition on July 26, 2005.

**Factual Background**

At Petitioner's trial, Frederick France, one of the victims of the shooting on January 10, 2000, testified that he was driving in Southfield, Michigan, at around 9:00 p.m., with Samuel Morris, the decedent.  Morris drove into the parking lot of a strip mall. Three to four males exited Lou's Deli, a restaurant located in the strip mall,  and crossed to the parking lot in front of France's and Morris' car.  Morris stopped to let the men pass. One of the men, later identified as Petitioner, was staring at Morris and France.  Petitioner continued to stare at Morris and France as he walked backwards toward a van, which was white and blue with gold rims.  France and Morris exited their vehicle and France yelled at Petitioner: "What you all looking at?"  Petitioner or one of the other men with him yelled back: "What the f-ck you're looking at."  Morris and France then returned to their car and began to drive away.

France then noticed the blue and white van approaching them.  When Morris stopped his car, the van drove past.  The driver of the van then backed up so the passenger's side window of the van was even with the driver's side window of Morris' car.  The vehicles were approximately four feet apart.  The passenger side window of the van was open.  France identified Petitioner as the front seat passenger of the van and Eric Purifoy as the driver of the van.

At that point, Petitioner said to France and Morris, "What you say, big dog?" Petitioner then pulled out a gun and began firing into the driver's side window of Morris' car.  France ran from the car, but was hit by several bullets as he tried to escape.  France

4

testified that he had no doubt that Petitioner was the passenger of the van and the individual who fired the shots.

Omar Stephens, who testified that he was Petitioner's friend, told the jury that about a month after the shooting, Petitioner told him that "he had to pop them niggers up." Stephens knew that Petitioner drove a van and carried a black and gold .45 caliber gun. Detective Christopher Helgert of the Southfield Police testified that shell casings found at the crime scene were from a .45 caliber gun. According to Stephens, Petitioner told him that he had to get rid of the van, but that before he did, he removed and sold the van's rims and stereo. When the police recovered the van, it was missing the gold rims and stereo. Stephens admitted that he had been convicted of armed robbery in 1999. Stephens also admitted that he only informed the police about Petitioner's statements to him after the Detroit Police arrested him in a drug case.

Petitioner eventually was arrested on February 19, 2001, in Ohio. Ben Damschroder, a police officer in Ohio, testified that he and other officers were dispatched to a car dealership in Meflen Township, Ohio, to arrest a homicide suspect. Prior to arriving at the dealership, Damschroder received a description of the vehicle Petitioner would be driving. Eventually, Damschroder observed the vehicle leave the dealership lot, followed by another vehicle. Damschroder followed the vehicles as they entered a parking lot about two hundred feet away from the dealership. Two individuals then exited each vehicle. As Damschroder did not have a description of Petitioner at that time, he ordered all four individuals to the ground. Petitioner fled the area on foot, but

5

subsequently was seized.

James Parrish, a police officer from Clinton Township, Ohio, assisted in
Petitioner's arrest.  Parrish recovered three types of identification from Petitioner, all of
which contained names other than Van Chester Thompkins.  Petitioner told the police that
his name was Detniuan Ishia Reed.  Officers from the Federal Bureau of Investigation
who arrived on the scene did not believe that Petitioner was the homicide suspect because
he did not look exactly like the picture on the suspect's "Wanted" poster and therefore
they decided not to take him into custody.  Parrish, however, believed that Petitioner was
the wanted suspect, particularly as Petitioner responded to Parrish when he called him
"Van."  Parrish therefore arrested Petitioner for obstruction based on his failure to obey
Damschroder's commands to stop.

On the third day of Petitioner's trial, Eric Purifoy also testified.  Prior to his
testimony, the prosecutor moved to exclude several letters that Purifoy allegedly wrote to
Petitioner based on the fact that defense counsel only produced them the preceding day.
In response to the prosecutor's motion, defense counsel claimed that he had not decided
whether to introduce the letter and that he only received the letters himself the night
before Petitioner's trial began.  The letters subsequently were introduced into evidence
without objection, with a statement read to the jury concerning their production.[1]

---

[1]The prosecutor's motion was resolved off-the-record and it is not clear who
prepared the statement read to the jury; although as Petitioner refers to the statement as a
"stipulation," the Court assumes that it at least was agreed to by both parties.

6

During his testimony, Purifoy described himself as an acquaintance of Petitioner and a friend of Myzell Woodward. Purifoy testified that on the day of the shooting, he, Woodward, and Petitioner went to Lou's Deli in Petitioner's van. After the three men finished eating, they walked outside.

According to Purifoy, he, Woodward, and Petitioner crossed in front of a red car as they walked toward Petitioner's van. The three men then got into the van; Purifoy drove, Petitioner sat in the front passenger seat, and Woodward sat in a rear seat. As they drove toward the exit of the parking lot, Purifoy noticed the passenger of the red car standing outside the car making gestures. Purifoy drove the van past the red car but then Petitioner told him to stop because "they had said something." Purifoy then backed up the van to where the red car was stopped. Purifoy heard someone say something and then heard gunshots. Purifoy ducked down into his seat and claimed that Petitioner did the same. Purifoy testified that he heard Petitioner say "what's up" and that when Purifoy sat back up in his seat, he saw Petitioner with a small, black, semi-automatic weapon. According to Purifoy, Petitioner then asked Purifoy "what the hell you doing" and ordered him to "pull off." Purifoy was unaware that anyone had been shot.

Purifoy was charged with first-degree murder, assault with intent to murder, and several weapons offenses arising from the January 10 shooting. At a separate jury trial, prior to Petitioner's trial, Purifoy was acquitted of the murder and assault charges but convicted of several weapons offenses. He subsequently pleaded guilty to additional weapons offenses arising from the incident. Purifoy was not given immunity for his

7

testimony in Petitioner's case.

Southfield Police Detective Christopher Helgert testified regarding his and his partner's interrogation of Petitioner following his arrest in Ohio.  According to Helgert, Petitioner first was read his *Miranda* warnings.  Petitioner neither requested an attorney nor indicated that he did not want to talk to the officers.  The officers spoke to Petitioner for approximately two hours and forty-five minutes.  Helgert and his partner did most of the talking; Petitioner occasionally responded only saying "yeah," "no," or "I don't know."  Helgert testified that towards the end of the interview, he asked Petitioner if he prayed to God.  Helgert testified that Petitioner said "yes" and that his demeanor changed at this point in that he looked directly at Helgert with moistened eyes.  Helgert then asked Petitioner: "Do you pray to God to forgive you for shooting that boy down?"  Helgert testified that Petitioner answered "yes" and then looked down.  The interview ended shortly thereafter.  During his testimony, in response to a question by Petitioner's counsel, Helgert stated: "I am absolutely convinced and am now that your client was there."

Helgert also testified that, prior to interviewing Stephens, the police had not disseminated to the public any information concerning the type of weapon used in the January 10 shooting.  Helgert acknowledged that Stephens gave his statement to the police only after he had been arrested and detained on a drug charge in Detroit.  Helgert denied making any promises to Stephens in exchange for his testimony.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides:

8

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).  In short, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law.  *Franklin v. Francis*, 144 F.3d 429 (6th Cir. 1998).  The federal court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1)[2]; *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

---

[2]     28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the
> judgment of a State court, a determination of a factual issue
> made by a State court shall be presumed to be correct.

9

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20 (2000).

With respect to the "unreasonable application" clause of Section 2254(d)(1), the United States Supreme Court has instructed that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case." *Id.* at 409, 120 S. Ct. at 1521. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . .
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 410-11, 120 S. Ct. at 1521-22.

## Discussion

10

## Petitioner's Prosecutorial Misconduct Claims

Petitioner alleges that he was deprived of a fair trial because of prosecutorial misconduct.[3]  When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that "the touchstone of due process . . . is the fairness of the trial, not the culpability of the prosecutor."  *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355-56 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 947 (1982)).  On habeas review, a court's role "is to determine whether the [prosecutor's] conduct was 'so egregious so as to render the entire trial fundamentally unfair.'" *Id.* (quoting *Cook v. BordenKircher*, 602 F.2d 117, 119 (6th Cir. 1979).  When analyzing a claim of prosecutorial misconduct, a court initially must decide whether the challenged statements were improper.  *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).  If the conduct is improper, the district court then must examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ.  *Id.*  In evaluating prosecutorial misconduct in a habeas case,

---

[3]Respondent contends that Petitioner's prosecutorial misconduct claims are procedurally defaulted because he failed to object to the alleged prosecutorial misconduct at trial and the Michigan Court of Appeals relied on his failure to object as a basis to reject the claims.  In the second issue raised in his petition, Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutorial misconduct.  Ineffective assistance of counsel may establish cause for procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52, 120 S. Ct. 1587, 1591 (2000).  Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of Petitioner's ineffective assistance of counsel claim, the Court finds it easier to simply consider the merits of his prosecutorial misconduct claim. *See Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

consideration should be given to the following: (a) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (b) whether the remarks were isolated or extensive; (c) whether the remarks were deliberately or accidentally placed before the jury; and, (d) the strength of the competent proof to establish the guilt of the accused. *Serra,* 4 F.3d at 1355-56 (citation omitted).

Petitioner first contends that the prosecutor improperly and on several occasions elicited evidence of the jury verdict in Purifoy's case. Petitioner contends that he was extraordinarily prejudiced by the introduction of this testimony because his defense was that Purifoy was the shooter. As Petitioner raises: "[i]f Purifoy's jury found him not guilty who did that leave as the shooter?" In other words, Petitioner suggests that evidence of the jury's verdict in Purifoy's case diluted the presumption of Petitioner's innocence. Petitioner argues that there was no legitimate basis for offering this evidence.

Second, Petitioner contends that he was prejudiced by testimony indicating that Purifoy had been charged as an aider and abettor in the January 10 shooting. Petitioner explains that such information bolstered Purifoy's testimony that Petitioner, not Purifoy, was the shooter. Petitioner complains that this point was bolstered by Helgert's testimony that the prosecutor's warrant for Purifoy was issued on an aiding and abetting theory. Applying the plain error rule, the Michigan Court of Appeals rejected these allegations of prosecutorial misconduct, explaining:

> To the extent it was improper for the prosecutor to introduce
> evidence of codefendant Purifoy's criminal conviction, *see*
> *People v. Lytal*, 415 Mich. 603, 612; 329 N.W.2d 738 (1982),

12

> defendant's substantial rights were not affected because the
> defense asserted that Purifoy was the shooter and that the
> evidence of Purifoy's conviction linked Purifoy to the gun.

*People v. Thompkins*, No. 242478, at 2 (Mich. Ct. App. Feb. 3, 2004)(unpublished

opinion).

The testimony regarding the outcome of Purifoy's trial was improper and should

not have been admitted.  The jury in Petitioner's case learned not only that Purifoy was

found guilty of possessing a gun, but also that Purifoy was acquitted of the first degree

murder and assault charges.  Thus while evidence of Purifoy's conviction on the gun

charges linked him to the gun, as the state court noted, the jury's acquittal of Purifoy with

respect to the murder and assault charges further suggested that he nevertheless was not

the shooter.  In other words, having learned that Purifoy was convicted on the weapons

charges but acquitted on the murder and assault charges, the jury in Petitioner's case may

have assumed that it was settled that there was a gun(s) in the van with Petitioner,

Purifoy, and Woodward, and that someone in the van– but not Purifoy– pulled the trigger.

With respect to Purifoy's convictions, such evidence "is generally inadmissible,

because it might lead the jury to 'regard the issue of the remaining defendant's guilt as

settled and [conclude that] the trial is a mere formality.'" *United States v. Modena*, 302

F.3d 626, 631 (6th Cir. 2002) (quoting *United States v. Griffin*, 778 F.2d 707, 711 (11th

Cir. 1985)).  However, if the defendant's accomplice testifies at trial, evidence of the

accomplice's convictions may be introduced so the jury can assess his credibility.  *Id*.

The trial court, however, must instruct the jury that it may not consider the accomplice's

13

conviction as evidence of the defendant's guilt. *Id*. Purifoy testified at Petitioner's trial, but the trial court failed to give the jury this cautionary instruction. Nevertheless, this Court believes the introduction of evidence regarding the outcome of Purifoy's trial did not "render the entire trial fundamentally unfair" in light of the overwhelming evidence identifying Petitioner, rather than Purifoy, as the shooter. *United States v. Wiedyk,* 71 F. 3d 602, 607-08 (6th Cir. 1995).

Petitioner next claims that the prosecutor improperly elicited testimony from Purifoy that Woodward– one of the individuals in the van at the time of the shooting– subsequently was charged with murder in Ohio and faced the death penalty. Petitioner argues that this testimony was not relevant and lacked any probative value. On the other hand, Petitioner contends that the testimony suggested to the jury that he associates with unsavory characters and therefore must be guilty of the crimes charged. Petitioner argues that he was further prejudiced by this testimony when the prosecutor repeatedly asked his girlfriend, Tomika Stephens, why Petitioner was in Ohio. Petitioner believes that this inquiry suggested to the jury that he somehow was involved in Woodward's crime.

The Michigan Court of Appeals rejected Petitioner's claims concerning the above testimony, stating: ". . . the evidence did not show that codefendant Woodward was convicted in this matter." By focusing on a conviction related to the incident on January 10– rather than Woodward's murder charge in Ohio– the state court apparently misunderstood Petitioner's argument. Nevertheless, this Court finds that the evidence was admissible as it was relevant to establish that Purifoy had a motive for lying and the

14

probative value of the evidence did not unduly prejudice Petitioner so as to deprive him of a fair trial.  As Respondent explains, the prosecutor asked Purifoy about Woodward's murder charge and the potential sentence Woodward faced on that charge in order to impeach Purifoy's claim that Woodward was the shooter.  The government wanted to show that Purifoy was blaming Woodward because he knew that Woodward would have nothing to lose if he were held responsible for the January 10 shooting.

Petitioner further contends that the prosecutor improperly elicited Helgert's opinion that he is "absolutely convinced and was then that [Petitioner] was there [at the shooting]" and improperly bolstered the officer's credibility by obtaining his statement that "[his] ultimate role as an investigator is to seek the truth."  Helgert's statements, however, were not elicited by the prosecutor but instead were responses to defense counsel's cross-examination.

Petitioner also claims that the prosecutor improperly elicited evidence that Petitioner exercised his right to remain silent when he was interviewed by the police following his arrest.  Because this claim is interrelated with Petitioner's third claim, *infra,* the Court will address this prosecutorial misconduct claim when addressing that claim.

Petitioner next contends that the prosecutor denigrated defense counsel in his closing arguments.  It is improper for an attorney to make "unfounded and inflammatory attacks" on opposing counsel. *United States v. Young*, 470 U.S. 1, 9, 105 S. Ct. 1038, 1043 (1985).  Nevertheless, ". . . a prosecutor's statements [about opposing counsel] must be viewed in context." *United States v. Catlett*, 97 F.3d 565, 572 (D.C. Cir. 1996).  When

15

viewed in context, the Court does not view the prosecutor's statements in Petitioner's case as attacks on the credibility or motive of defense counsel. For example, the Court does not read the prosecutor's statement concerning the surveillance tape at Lou's Deli as suggesting that defense counsel would have concocted a different story if there were no such tapes and thus no indisputable evidence establishing Petitioner's presence at the deli before the shooting. Instead, the Court reads the prosecutor's comment as suggesting that *Petitioner* would have denied being at the scene but for the videotape establishing otherwise. To the extent any statements did denigrate defense counsel, however, the Court finds the comments harmless.

Petitioner claims that the prosecutor improperly questioned witnesses about Petitioner's one year absence from Michigan and his activities during that period, thereby suggesting that Petitioner was involved in other unspecified crimes in different states during that time. Petitioner further contends that testimony regarding efforts to find him after the shooting that referred to searches through the records of different police departments suggested to the jury that he may have been convicted of or charged with crimes in those jurisdictions.

Under Michigan and Federal law, flight is relevant to consciousness of guilt. *Brown v. Palmer*, 441 F.3d 347, 352 (6th Cir. 2006); *Johnson v. Burke*, 903 F.2d 1056, 1062 (6th Cir. 1990) (citing *People v. Mindeman*, 157 Mich. 120, 121-22, 121 N.W. 488, 489-90 (1909) and *People v. Stull*, 127 Mich. App. 14, 17, 338 N.W.2d 403, 406 (1983)). Because evidence concerning Petitioner's flight to Ohio and possibly to several other

16

states was admissible to show his consciousness of guilt, the prosecutor did not engage in

prosecutorial misconduct by admitting such evidence.  Helgert's brief remark that the

Michigan officers looked at documents from other police departments that contained

information about Petitioner did not inform the jury that Petitioner had prior convictions

in other states and it would be purely speculative to conclude that the jury made such an

assumption based on this testimony.  In any event, the Court finds Helgert's limited

testimony on this issue harmless in light of the overwhelming evidence of Petitioner's

guilt in this case.

Petitioner next contends that the prosecutor offered unfair prejudicial information

when it introduced into evidence the letters Purifoy wrote to Petitioner.  According to

Petitioner, he was prejudiced by the admission of the letters because they allowed the

prosecution to introduce the fact that he was incarcerated while awaiting trial, informed

the jury that Woodward possibly was facing the death penalty in Ohio, and suggested that

Petitioner and Purifoy concocted Petitioner's defense.  As an initial matter, the Court

notes that it was the defense that first proposed introducing Purifoy's letters.  In any

event, the admission of the letters did not violate Petitioner's rights.

The Court already has addressed the evidence regarding Woodward's charges in

Ohio.  As to Petitioner's incarceration while awaiting trial, as there was no suggestion

that Petitioner was incarcerated for a prior conviction, any fleeting reference to that fact

did not render his trial fundamentally unfair.  *See e.g. Tolbert v. LeCureaux,* 811 F. Supp.

1237, 1244 (E.D. Mich. 1993).  With regard to Petitioner's assertion that the letters were

17

inadmissible because they suggested that he and Purifoy concocted or "cooked up" his defense, Purifoy's statements in his letters provided the prosecutor with a good faith basis to believe that Purifoy and Petitioner were discussing possible defenses in their correspondences.  Clearly this evidence was admissible to impeach Purifoy's credibility. "'[I]t is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from evidence that the prosecutor believes in good faith might be true.'" *Shaw v. Terhune,* 380 F.3d 473, 480 (9th Cir. 2004) (quoting *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002)).  Thus the admission of the letters did not violate Petitioner's rights.  *See e.g. United States v. Smith,* 982 F. 2d 681, 683 (1st Cir. 1993) (prosecutor's statement that the witness and the defendant had "concocted" their story was proper because it suggested inferences that the jury could draw from the conflicting evidence).

Petitioner next contends that the prosecutor argued facts not introduced into evidence when he argued that Purifoy and France, *before knowing what the other would say*, identified Petitioner as the passenger of the vehicle and Purifoy as the driver. Petitioner contends that this was misleading because Purifoy in fact previously heard France's testimony at Purifoy's preliminary examination and trial.  Well before that time, however, when first contacted by the police, Purifoy admitted that he "might have been there" but was not the shooter.  When interviewed by the police the day after the shooting, France identified Purifoy as the driver and Petitioner as the shooter.  Thus the prosecutor's argument was supported by facts in evidence.  In any event, the trial judge

18

instructed the jury that the arguments of counsel were not evidence.

Petitioner next claims that the prosecutor attempted to garner sympathy for the victim and the victim's mother. The Michigan Court of Appeals agreed that the prosecutor made an improper appeal to sympathy in his opening statement, but found that the misconduct did not deprive Petitioner of a fair trial. This Court agrees, as the remark was brief and isolated and the trial court subsequently instructed the jury that it could not let sympathy influence its decision. *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Finally, Petitioner contends that the prosecutor shifted the burden of proof in his rebuttal argument. Having reviewed the prosecutor's argument, the Court does not believe this to be true. Nevertheless, any possible prejudice resulting from the prosecutor's comments was cured by the trial court's instructions regarding the proper burden of proof. *See Scott v. Elo,* 302 F.3d 598, 603-04 (6th Cir. 2002).

In short, Petitioner fails to show that he was deprived of a fair trial because of prosecutorial misconduct. The Court therefore concludes that he is not entitled to habeas relief based on his first claim.

### Ineffective Assistance of Counsel

Petitioner claims that he was deprived the effective assistance of counsel. The federal courts apply a two-part test to evaluate ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. This requires

> showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 666, 687, 104 S. Ct. 2052, 2064 (1984).  In assessing

counsel's performance, courts must consider "whether 'counsel's representation fell

below an objective standard of reasonableness,' as measured by 'prevailing professional

norms.'"  *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (quoting *Strickland*, 466

U.S. at 687-88, 104 S. Ct. at 2064-65).  There is a strong presumption that counsel's

behavior lies within the wide range of reasonable professional assistance.  *Strickland*, 466

U.S. at 687, 104 S. Ct. at 2064.  "To establish prejudice, a defendant must demonstrate a

reasonable probability that 'but for counsel's unprofessional errors, the result of the

proceeding would have been different.'"  *Rickman*, 131 F.3d at 1155 (quoting *Strickland*,

466 U.S. at 694, 104 S. Ct. at 2068).

Petitioner first contends that his counsel was ineffective in that he failed to object

to the prosecutorial misconduct described in his first claim.  Because this Court has

concluded that the claimed misconduct did not prejudice Petitioner, Petitioner's claim that

counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's

conduct and remarks also must be rejected.

Petitioner next contends that his trial counsel improperly entered into two

stipulations that were read to the jury.  The first stipulation blamed Petitioner for failing

to produce Purifoy's letters prior to trial, in violation of the trial court's discovery order.

The second stipulation related to Petitioner's prior felony conviction as relevant to his

felon in possession charge.

As referred to earlier, Purifoy wrote Petitioner several letters while the two were incarcerated.  Petitioner and Respondent acknowledge that the letters strongly suggest that Purifoy was a complete liar.  In the prosecution's request for discovery, filed July 3, 2001, the prosecution requested *inter alia* "any written or recorded statements by lay witnesses" and "any document, photograph or other paper that the defendant intends to introduce at trial."  These requests were submitted by the prosecutor in accordance with the mandatory disclosures required under Michigan Court Rule 6.201(A).  Purifoy was listed on the Information as a witness the prosecution intended to call; however, defense counsel did not produce Purifoy's letters until the second day of trial– before Purifoy actually testified but after the prosecutor told the jury during his opening statement that Purifoy would be testifying and what the contents of his testimony would be.  The prosecutor therefore moved to exclude the letters from evidence, arguing that defense counsel's failure to provide them earlier was a violation of "the discovery order" and that introduction of the letters was unfairly prejudicial.  As the prosecutor argued to the court, if he had received the letters before the trial, he may have decided to not call Purifoy as a witness.

Although the prosecutor's motion was not resolved on the record, the letters eventually were utilized with the following statement read to the jury following Purifoy's testimony:

Ladies and Gentlemen of the Jury, the letters that you have

21

heard were written by Eric Purifoy and have been in custody
of the – have been in the custody of the Defendant way back
to May of two thousand and one (2001).

The Defendant was required to turn the letters over to the
Prosecution in July of two thousand and one (2001), but failed
to do so.

The letters were not turned over to the Prosecution until after
the trial began.  The Court finds this was an intentional
violation on the part of the Defendant.

The trial court did not inform the jurors that the parties had stipulated to the statement,

but simply read the statement after Purifoy left the stand. The prosecutor reminded the

jurors of Petitioner's discovery violation during his closing argument.

Petitioner argues that his counsel did not have to agree to the above statement; but

even so, that he should not have agreed to the statement as written.  Petitioner further

argues that, "[b]y entering into this stipulation, defense counsel [showed] to the jury that

he did not believe in his client's innocence." As the Michigan Court of Appeals correctly

concluded, however, defense counsel's decision to use the Purifoy letters– and therefore

willingness to agree to the stipulation in order to avoid their exclusion[4]– should not be

second-guessed.  The letters clearly were harmful to the prosecution's case as they

---

[4]Petitioner argues that the Michigan Court Rules did not require him to produce the
letters because Rule 6.201 only mandates discovery of "written or recorded statement[s]
by a lay witness whom the party intends to call at trial" and Petitioner never intended to
call Purifoy. Rule 6.201, however, further mandates discovery of "any document . . . or
other paper that the party intends to introduce at trial."  MCR 6.201(A)(5).  Purifoy was
listed as a prosecution witness and defense counsel intended to use the letters to impeach
him during cross-examination.

22

undermined Purifoy's credibility.  Additionally, in light of the language of the statement and the fact that the trial court did not tell the jury that the prosecutor and the defendant had stipulated to the statement, the Court does not believe that it informed or suggested to the jurors that defense counsel agreed to its language.  Therefore this Court finds no reason why the stipulation would suggest to them that defense counsel did not believe in his client's innocence.

The second stipulation concerns the proof of Petitioner's prior felony conviction to support the felon in possession charge.  The trial court read the stipulation to the jury as follows:

> This is a stipulation between the Plaintiff, the People, and the Defense:
>
> "On January 10, 2000 the defendant was convicted of a felony and less than five years had passed since all imprisonment and/or all the terms of probation have been served."

It is not clear from the record whether the trial court inaccurately read the stipulation or whether the stipulation itself was incorrectly written.  Nevertheless, Petitioner does not dispute that he had a prior felony conviction as he indicates that the stipulation should have read: "On January 1998" or "As of January 10, 2000, the defendant had been convicted of a felony."  *See* Br. in Support of Petition at 33.  Petitioner, however, argues that he was prejudiced by the stipulation because "the jury could infer that [he] had been convicted of the prior felony earlier on the day on which he committed the murder" and therefore "allowed them to speculate that [he] was unrepentant and incorrigible."  *See id.*

23

The Court finds it purely speculative that the jury assumed from this instruction that Petitioner was convicted of a felony on the date of the shooting, as Petitioner argues. The Court finds it more probable that the jury had no idea what fact the stipulation was meant to convey.  In any event, to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, a habeas petitioner must make more than merely speculative assertions.  *Bowen v. Foltz,* 763 F.2d 191, 194 (6th Cir. 1985).  The Court finds no reason to believe that this poorly worded stipulation prejudiced Petitioner.

Petitioner next contends that counsel was ineffective for failing to request a cautionary instruction that evidence regarding Purifoy's conviction only was relevant as to the issue of Purifoy's credibility, and not as to Petitioner's guilt.  While the Court agrees that effective counsel would have requested such an instruction, the Court does not believe that the introduction of evidence regarding Purifoy's convictions rendered Petitioner's trial fundamentally unfair.

Petitioner also claims that his counsel failed to effectively undermine Stephens' credibility.  Specifically, Petitioner contends that his counsel should have requested an instruction that a prior conviction for a crime involving theft or dishonesty– in Stephens' case, armed robbery– can be used to decide whether to believe the witness.  Petitioner also believes that his attorney should have attacked Stephens' credibility during his closing argument.  During his cross-examination of Stephens, however, defense counsel impeached Stephens' credibility on a number of different issues.  The fact of Stephens'

24

armed robbery conviction also was elicited during his testimony.  Thus the Court cannot find that the outcome of Petitioner's trial would have been different if defense counsel had done more.

Similarly, Petitioner is not able to demonstrate a reasonable probability that the result of the proceeding would have been different if his trial counsel had requested a limiting instruction that his prior felony conviction only could be considered with respect to his felon in possession charge.  The specific nature of Petitioner's prior felony was not even raised during the trial.  Additionally, the trial court specifically instructed the jury that it was to weigh the evidence as to each separate charge.

Petitioner next contends that counsel was ineffective for stating, during his cross-examination of Parrish, that counsel did not dispute the obstruction charge brought against Petitioner in Ohio.  Petitioner explains that it is unreasonable trial strategy for an attorney to bring out his client's arrests without convictions.  This evidence, however, was not brought out by defense counsel initially. During the prosecutor's direct examination of Parrish, Parrish explained that he arrested Petitioner for obstruction when the FBI declined to arrest him as the murder suspect.  Defense counsel, during cross-examination, simply responded "not disputed" when Parrish again began explaining why he arrested Petitioner.  Under these circumstances, where counsel in fact may have made the statement in order to avoid a further discussion of Petitioner's other bad act, the Court cannot find that counsel's performance was deficient.

Petitioner next contends that counsel was ineffective for not moving to excise

25

portions of Purifoy's letters, which Petitioner claims contained prejudicial and inflammatory references. The Court does not believe that the statements in the letters to which Petitioner refers were unduly inflammatory or prejudicial. Nevertheless, as defense counsel introduced the letters in an attempt to shift the blame to Purifoy– the author of the letters– the Court cannot question his decision to offer their entire contents.

Petitioner claims that counsel was ineffective for failing to investigate Stephens' motive for testifying. According to Petitioner, Stephens expected a plea bargain in a pending Wayne County drug case in exchange for his testimony at Petitioner's trial. Helgert, however, testified that he never made any promises to Stephens in exchange for his testimony. In fact, approximately six months before Petitioner even was apprehended in Ohio– and therefore before there ever was a prospect of Petitioner's case going to trial– Stephens' drug charges were resolved pursuant to a guilty plea and he was sentenced to probation under the supervision of the drug court. In any event, defense counsel thoroughly challenged Stephens' credibility, including eliciting information from which a jury could question Stephens' true motive for informing the police about Petitioner's admission.

Petitioner lastly contends that trial counsel was ineffective in that he failed to challenge, on Sixth Amendment grounds, Petitioner's statement to the police after he was apprehended in Ohio. According to Petitioner, his Sixth Amendment right to counsel had attached before he was interviewed by officers in Ohio. Petitioner basis his argument on his belief that a defendant cannot waive his right to an extradition hearing without first

26

receiving the advice of counsel and the fact that he already had agreed to be extradited.

"The Sixth Amendment does not mandate a right to counsel [in interstate extradition] proceedings, since an extradition hearing has a modest function not involving the question of guilt or innocence." *United States v. Doherty,* 126 F.3d 769, 782 (6th Cir. 1997) (internal quotation marks omitted), partially abrogated on other grounds by *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335 (2001). Although most states provide a statutory right to counsel at such proceedings, "the invocation of a statutory right to counsel at an extradition hearing does not require the invalidation of a subsequent confession . . . even where the defendant is being extradited on the same crime on which he is ultimately tried, and the confession is in regards to that crime." *Id.* (citation omitted). Counsel, therefore, was not ineffective in failing to seek the suppression of Petitioner's confession on Sixth Amendment grounds.

For the reasons set forth above, Petitioner fails to show that he was deprived of the effective assistance of trial counsel and is not entitled to habeas relief on his second claim.

### Petitioner's Fifth Amendment Claim

Petitioner argues that the state courts erred in concluding that he failed to invoke his right to remain silent and that his limited statements to the police were not the result of coercion. In rejecting this claim, the Michigan Court of Appeals wrote, in part:

> The record discloses that defendant was advised of his *Miranda* rights and, according to the interrogating officer, verbally acknowledged that he understood those rights.

27

> Contrary to defendant's argument, the record does not
> demonstrate that defendant asserted his right to remain silent.
> Although defendant refused to sign the advice of rights form,
> he continued to talk with the officer, albeit sporadically.  He
> answered questions with brief responses, or by nodding his
> head, but he never said he did not want to talk or that he was
> not going to say anything.  "When a defendant speaks after
> receiving *Miranda* warnings, a momentary pause or even a
> failure to answer a question will not be construed as an
> affirmative invocation by the defendant or a right to remain
> silent."

*People v. Thompkins,* No. 242478, at 2 (Mich. Ct. App. Feb. 2, 2004)(unpublished

opinion)(internal footnote omitted)(quoting *People v. McReavy*, 436 Mich. 197, 222, 462

N.W.2d 1 (1990)).

In *Miranda v. Arizona*, the Supreme Court held that the interrogation of a suspect

must cease when the suspect invokes his right to remain silent or his right to the

assistance of counsel.  384 U.S. 436, 474, 86 S. Ct. 1602, 1627 (1966).  If an accused

wishes to invoke his right to counsel, however, he must do so unambiguously.  *Davis v.*

*United States*, 512 U.S. 452, 458-59, 114 S. Ct. 2350, 2355 (1994).  As the Supreme

Court held in *Davis*, ". . . if a suspect makes reference to an attorney that is ambiguous or

equivocal in that a reasonable officer in light of the circumstances would have understood

only that the suspect *might* be invoking the right to counsel our precedents do not require

the cessation of questioning."  *Id*. at 459, 114 S. Ct. at 2355 (emphasis in original).

Although *Davis* concerned the right to counsel, "[n]onetheless, every circuit that has

addressed the issue squarely has concluded that *Davis* applies to both components of

*Miranda*: the right to counsel and the right to remain silent."  *Bui v. DiPaola*, 170 F.3d

28

232, 239 (1st Cir. 1999) (collecting cases).  "A refusal to sign a written waiver form does not conclusively indicate that the suspect wishes to remain silent. *Jones v. Dugger*, 928 F.2d 1020, 1027 (11th Cir. 1991) (citing *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755 (1979)).

The record does not establish that Petitioner clearly and unequivocally invoked his right to remain silent after Helgert advised him of his *Miranda* rights.  While the officers did most of the talking during their meeting with Petitioner, Helgert testified that Petitioner sometimes nodded his head or verbally responded "yeah," "no," or "I don't know" in response to their dialogue.  According to Helgert, Petitioner neither requested an attorney nor informed the officers that he did not want to speak to them.  Petitioner's refusal to sign or initial the written waiver form, to provide a written statement to the police, and to answer some questions did not constitute an unequivocal assertion of his right to remain silent.  The Michigan Court of Appeals' rejection of Petitioner's Fifth Amendment claim, therefore, was not an unreasonable application of clearly established law.

Petitioner also claims that his statements to the officers were involuntary, contending that they were coerced after three hours of interrogation and as a result of the officer's appeal to Petitioner's religious beliefs.  The trial court found Petitioner's statements voluntary, reasoning:

> Here, there is no claim that the police subjected the defendant to threatened or actual physical abuse, or deprived him of food or medical attention.  Additionally, the defendant was

29

> not injured or ill when he spoke to the detectives. . . .  Further,
> the police did not detain the defendant excessively, especially
> given the serious nature of the crimes they were investigating.

*People v. Thompkins*, No. 01-78216, 5/10/02 Op. and Order Denying Def.'s Mot. to

Suppress Statements at 3-4 (Kuhn, J.).  The Michigan Court of Appeals held that "[t]he

trial court did not clearly err in concluding that Defendant voluntarily waived his right to

remain silent."  *People v. Thompkins*, No. 242478, at 2 (Mich. Ct. Appeals Feb. 3, 2004).

This Court finds that the state courts' decisions were neither contrary to nor an

unreasonable application of clearly established law and that the trial court did not base its

decision on an unreasonable determination of the facts.  Under the totality of the

circumstances, Petitioner's statements were obtained in a manner compatible with the

Fifth Amendment.  Except for Helgert's statements concerning Petitioner's religious

beliefs, Petitioner fails to identify any facts rendering the circumstances of his

interrogation coercive.  An appeal to a suspect's religious beliefs does not, on its own,

render the suspect's confession involuntary.  *See Welch v. Butler*, 835 F.2d 92, 95 (5th

Cir. 1988); *Barrera v. Young,* 794 F. 2d 1264, 1270 (7th Cir. 1986).  As the Seventh

Circuit noted in *Barrera*: "It is difficult to describe an appeal to religious beliefs as

unacceptable in our society; such appeals are common parts of life and need not cease at

the door of the jail." *Berrera*, 794 F.2d at 1270.  Therefore, the mere fact that Helgert

appealed to Petitioner's religious sensibilities, in the absence of any other coercive tactics,

did not render Petitioner's confession involuntary.  As the Court concludes that Petitioner

did not exercise his right to remain silent when interviewed by Helgert and his partner,

the Court finds no merit to Petitioner's claim that the prosecutor improperly elicited evidence showing that Petitioner exercised this right.  *See supra*.

### Petitioner's Challenge to France's In-Court and Out-of-Court Identifications

Lastly, Petitioner claims that the trial court erred in failing to suppress France's in-court identification on the ground that it was the product of a suggestive pre-trial identification procedure.  Petitioner argues that the still photograph from the surveillance video of Lou's Deli that the officers first showed to France the day after the shooting was unduly suggestive.  Petitioner further asserts that the police subsequently visited France, showed him photographs of Petitioner, and told him that Petitioner was the shooter.

"The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification."  *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (citing *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S. Ct. 1967 (1967) and *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972)).  "It is the likelihood of misidentification which violates a defendant's right to due process."  *Biggers*, 409 U.S. at 198, 93 S. Ct. 381-82.  "[R]eliability is the linchpin in determining the admissibility of identification testimony."  *Manson v. Braithwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977).  Courts must consider five factors in determining whether an identification is so unnecessarily suggestive that it must be suppressed: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty

31

demonstrated by the witness at the confrontation; and (5) the length of time between the

time and the confrontation.  *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382.

Having considered the above factors, this Court finds the state court's decision that

France's identification of Petitioner was not unduly suggestive to be neither contrary to

nor an unreasonable application of clearly established law.  France initially observed

Petitioner as Petitioner walked directly in front of the vehicle in which France was sitting.

As Petitioner walked by France's car, he was staring at France and Morris and therefore

likely drew their attention.  France and Morris actually got out of their car and continued

to watch Petitioner as Petitioner walked towards his van.  As France testified at

Petitioner's preliminary examination hearing, he never took his eyes from Petitioner.

Moreover, France had the opportunity to observe Petitioner when the van pulled

alongside Morris' car.  The two vehicles were approximately four feet apart and

Petitioner's window was open.  The officers showed France a still photograph from the

surveillance tape the day following the shooting.  They did not tell France that anyone in

the photograph was a suspect, but merely presented the photograph to France to

determine whether the three individuals in the picture were the black males France

described walking out of Lou's deli.  France immediately identified Petitioner as the

shooter and Purifoy as the driver of the van.

As France's initial identification of Petitioner was not unduly suggestive, it is not

relevant whether the police pointed out Petitioner in other photographs during subsequent

meetings.  Moreover, France's subsequent in-court identification of Petitioner also was

not tainted.  Accordingly, the Court concludes that Petitioner is not entitled habeas relief based on this claim.

**Conclusion**

For the reasons stated above, the Court concludes that the state courts' adjudication of Petitioner's claims was neither contrary to nor an unreasonable application of clearly established law or an unreasonable determination of the facts in the light of evidence presented in the state court proceedings.  The Court therefore concludes that Petitioner is not entitled to habeas corpus relief.

Accordingly,

**IT IS ORDERED THAT**, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED WITH PREJUDICE**.

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:
Elizabeth L. Jacobs, Esq.
Brad H. Beaver, Esq.